## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS

LISA MARTENEY, *individually and on behalf of all others similarly situated,*

  Plaintiff,

   v.

ANM MEDIA LLP, Inc. d/b/a MY-CPE,

  Defendant.

Case No.: 4:24-cv-4511

**CLASS ACTION**

**JURY TRIAL DEMANDED**

## CLASS ACTION COMPLAINT

  Plaintiff Lisa Marteney brings this class action lawsuit, on behalf of herself and all other persons similarly situated, against Anm Media LLP, d/b/a MY-CPE ("MY-CPE" or "Defendant") for violations of the federal Video Privacy Protection Act, 18 U.S.C. § 2710 ("VPPA"). Plaintiff's allegations are made further to the investigation of her counsel and based upon information and belief, except as to allegations specifically pertaining to herself and her counsel, which are based on personal knowledge.

## NATURE OF THE ACTION

  1. This case is a consumer digital privacy class action lawsuit against MY-CPE for violating the VPPA by disclosing its digital subscribers' ("Subscribers") personally identifiable information which includes information that identifies a person as having requested or obtained specific video materials or services from Defendant ("Personally Identifiable Information") to Meta Platforms, Inc. ("Facebook") and other third parties without proper consent.[1]

---

[1] While this complaint focuses on unauthorized disclosures to Facebook, Plaintiff's counsels'

2.      The VPPA prohibits "video tape service providers," such as MY-CPE, from knowingly disclosing consumers' personally identifying video viewing information including "information which identifies a person as having requested or obtained specific video materials or services from a video tape provider," without express consent in a stand-alone consent form. *See* 18 U.S.C. § 2710(a)(3).

3.      MY-CPE provides online continuing education requirements for 100+ professional qualifications, including those in accounting, tax, finance, and human resources.[2] MY-CPE markets and sells business professionals access to its digital library on its website, www.MY-CPE.com ("Website"),[3] and its mobile app so that they may view prerecorded video materials to prepare for the professional exams such as, for example, the Certified Management Accountant ("CMA") Exam or the Certified Public Accountant ("CPA") Exam, and to fulfill their Continuous Professional Education ("CPE") requirements for over 100 professional qualifications.[4]

---

investigation shows that MY-CPE also installed tracking codes from several other big tech data brokers such as Clarity (Microsoft), HotJar and Google, among others, on its Website.

[2] *See* https://my-cpe.com/continuing-education-requirements.

[3] MY-CPE's Website contains subdomains for different course materials, such as https://my-cpe.com/continuing-education/cpa-us, https://my-cpe.com/continuing-education/cma, https://my-cpe.com/continuing-education/cfe. The same Meta Pixel is installed across all these subdomains, capturing MY-CPE subscribers' video viewing history and habits in the same manner.

[4] *See* https://my-cpe.com/. Absent discovery, Plaintiff is unable to independently confirm whether MY-CPE installed third-party tracking technologies on its mobile app and/or any other digital platforms owned, controlled, and/or operated by MY-CPE. However, given the presence of such trackers on the MY-CPE Website, Plaintiff alleges, upon information and good faith belief, that Defendant is capturing and sharing its Subscribers' Personal Viewing Information via the mobile app as well.

4.    According to MY-CPE, they have over 13,000 hours of CPE content, over 700 expert instructors, and 75 advanced certificate programs offered.[5]

5.    MY-CPE charges its Subscribers an annual subscription fee of $199.[6]

6.    Defendant has systematically transmitted (and continues to transmit today) its subscribers' personally identifiable video viewing information to Facebook using a snippet of programming code called the "Meta Pixel" (the "Pixel"), which Defendant chose to install and configure on its Website.

7.    The information Defendant disclosed (and continues to disclose) to Meta via the Pixel includes the subscriber's Facebook ID ("FID") and the title of the specific prerecorded video material that each of its Subscribers requested or obtained on its Website. An FID is a unique sequence of numbers linked to a specific Facebook profile.  A Facebook profile, in turn, identifies by name the specific person to whom the profile belongs (and also contains other personally identifying information about the person).  Entering "Facebook.com/[FID]" into a web browser returns the Facebook profile of the person to whom the FID corresponds.  Thus, the FID identifies a person more precisely than a name, as numerous persons may share the same name, but each person's Facebook profile (and associated FID) uniquely identifies one and only one person. In the simplest terms, the Pixel installed by Defendant captures and discloses to Facebook information that reveals the specific Personally Identifiable Information of the User.

---

[5] *See* https://MY-CPE.com/.

[6] *See, e.g.,* https://my-cpe.com/continuing-education/cpa-us; https://my-cpe.com/continuing-education/cma.

8.     The Subscribers are not aware that through the use of the Pixel and other third-party tracking technologies, MY-CPE tracks and discloses to unauthorized third parties its Subscribers' Personally Identifiable Information, nor have they consented to share such information.

9.     Importantly, MY-CPE shares the Personally Identifiable Information—*i.e.*, its Subscribers' unique ID and video content requested, obtained, and/or viewed together—with third parties such as Facebook as one data point meaning that any ordinary person can use it to quickly and easily locate, access and view Subscribers' corresponding account(s) and/or profile(s).

10.     Without informing its Subscribers, MY-CPE profits from its unauthorized disclosure of its Subscribers' Personally Identifiable Information, from the advertising and information services that stem from use of the Pixel, at the expense of its Subscribers' privacy and their statutory rights under the VPPA.

11.     Because MY-CPE Subscribers are ***not*** informed about this collection and disclosure of their Personally Identifiable Information—as it is automatic and invisible—they cannot make informed decisions as to which, if any, videos to watch nor take any proactive measures to defend themselves against the highly personal ways MY-CPE has used and continues to use the data it has about them to make money for itself.

12.     MY-CPE chose to disregard Plaintiff's and millions of others of its Subscribers' statutorily protected privacy rights by releasing their sensitive data to third parties.

13.     The VPPA clearly prohibits what Defendant has done.  Subsection (b)(1) of the VPPA provides that, absent the consumer's prior informed, written consent, any "video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider shall be liable to the aggrieved person for," 18 U.S.C. § 2710(b)(1), damages in the amount of $2,500.00, see id. § 2710(c).

4

14.     Plaintiff brings this class action for legal and equitable remedies to redress and put a stop to MY-CPE's practices of intentionally disclosing its Subscribers' Personally Identifiable Information to Facebook or any other third parties in knowing violation of VPPA.

## PARTIES

15.     Plaintiff Lisa Marteney is, and has been at all relevant times, a resident of Tampa, Hillsborough County, Florida, and intends to remain there.

16.     Defendant Anm Media LLP, d/b/a MY-CPE is a Wyoming business with its principal place of business at 1600 Highway 6 South, Suite 250 in Sugar Land, Texas, 77478.

17.     Defendant owns and operates its website, available at www.MY-CPE.com, which is used throughout the United States.

## JURISDICTION AND VENUE

18.     This Court has federal subject matter jurisdiction pursuant to 28 U.S.C. § 1331 over the claims that arise under the VPPA, 18 U.S.C. § 2710. This Court also has jurisdiction under 28 U.S.C. § 1332(d) because this action is a class action in which the aggregate amount in controversy for the proposed Class (defined below) exceeds $5,000,000 and at least one member of the Class is a citizen of a state different from that of Defendant.

19.     This Court has personal jurisdiction over Defendant because Defendant has its principal place of business and regularly conducts business in the State of Texas.

20.     Personal jurisdiction is also proper because Defendant has intentionally directed its business activities in Texas, targeting the Texas market, and purposefully availed itself of the privilege of conducting business in this state, including by providing courses and videos specifically aimed at satisfying requirements of the Texas State Board for Public Accountancy and Texas CPA CPE requirements.  In addition, the conduct underlying the claims that caused

Plaintiff's injuries took place in Texas, that is, Defendant's interception and disclosure of Plaintiff's Personally Identifiable Information occurred in this state which was foreseeable to Defendant.

21.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this District.

## FACTUAL BACKGROUND

### I.    The Background of the VPPA.

22.    The VPPA generally prohibits the knowing disclosure of information that personally identifies consumers (like Plaintiff) as having viewed particular videos or other audio-visual materials without the informed, written consent of the customer in a form "distinct and separate from any form setting forth other legal or financial obligations." Under the statute, the Court may award actual damages (but not less than liquidated damages of $2,500.00 per person), punitive damages, equitable relief, and attorney's fees.

23.    Specifically, subject to certain exceptions that do not apply here, the VPPA prohibits "a video tape service provider" from "knowingly disclos[ing], to any person, personally identifiable information concerning any consumer of such provider[.]"  18 U.S.C. § 2710(b)(1). The statute defines a "video tape service provider" as "any person, engaged in the business . . . of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials," 18 U.S.C. § 2710(a)(4).  It defines a "consumer" as "a renter, purchaser, or subscriber of goods or services from a video tape service provider."  18 U.S.C. § 2710(a)(1).  "'[P]ersonally identifiable information' includes information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider."  18 U.S.C. § 2710(a)(3).

24.     The VPPA was initially passed in 1988 for the explicit purpose of protecting the privacy of individuals' and their families' video rental, purchase and viewing data. Leading up to its enactment, members of the United States Senate warned that "[e]very day Americans are forced to provide to businesses and others personal information without having any control over where that information goes." S. Rep. No. 100-599 at 7-8 (1988).

25.     Senators at the time the VPPA was passed were particularly troubled by disclosures of records that reveal consumers' having viewed or purchased videos and other audiovisual materials because records of this nature offer "a window into our loves, likes, and dislikes," such that "the trail of information generated by every transaction that is now recorded and stored in sophisticated record-keeping systems is a new, more subtle and pervasive form of surveillance." S. Rep. No. 100-599 at 7-8 (1988) (statements of Sens. Simon & Leahy, respectively).

26.     In proposing the Video and Library Privacy Protection Act (later codified as the VPPA), Senator Leahy stated that "[i]n practical terms our right to privacy protects the choice of movies that we watch with our family in our own homes. And it protects the selection of books that we choose to read." 134 Cong. Rec. S5399 (May 10, 1988). Thus, the personal nature of such information, and the need to protect it from disclosure, is the inspiration of the statute: "[t]hese activities are at the core of any definition of personhood. They reveal our likes and dislikes, our interests, and our whims. They say a great deal about our dreams and ambitions, our fears and our hopes. They reflect our individuality, and they describe us as people." *Id*.

27.     While these statements rang true in 1988 when the VPPA was passed, the importance of legislation like the VPPA in the modern era of data mining from online activities is more pronounced than ever before.

28.     During a recent Senate Judiciary Committee meeting, "*The Video Privacy Protection Act: Protecting Viewer Privacy in the 21st Century*," Senator Leahy emphasized the point by stating: "[w]hile it is true that technology has changed over the years, we must stay faithful to our fundamental right to privacy and freedom. Today, social networking, video streaming, the 'cloud,' mobile apps and other new technologies have revolutionized the availability of Americans' information."[7]

29.     In this case, MY-CPE chose to deprive Plaintiff and the Class members of that right by knowingly and systematically disclosing their Personally Identifiable Information to unauthorized third parties without providing notice or obtaining consent from anyone, as explained herein.

## II.    MY-CPE's Digital Subscriptions.

30.     To register for MY-CPE's online courses, Subscribers create a profile and account with Defendant on its digital properties such as the Website and the MY-CPE mobile app.

31.     MY-CPE Subscribers provide their personal information, including but not limited to their name, email address, address or postal code, and payment method(s).

32.     MY-CPE's online courses are available as videos online and on a broad range of devices, including mobile phones and other mobile devices.

33.     On information and belief, all Subscribers provide Defendant with their IP address, which is a unique number assigned to all information technology connected devices, that informs Defendant as to subscribers' city, zip code and physical location.

---

[7] *See* Committee on the Judiciary, Subcommittee on Privacy, Technology and the Law, The Video Privacy Protection Act: Protecting Viewer Privacy in the 21st Century, Senate Judiciary Committee Subcommittee on Privacy, Technology and the Law, https://www.judiciary.senate.gov/meetings/the-video-privacy-protection-act-protecting-viewer-privacy-in-the-21st-century.

34.     When opening an account, MY-CPE does not adequately disclose to its Subscribers that it will share their Personally Identifiable Information with third parties. Subscribers are also not asked to consent to disclosing such information.

35.     After becoming a subscriber, Subscribers have access to a variety of video materials through MY-CPE's website or app.

36.     Notably, once a User signs in and watches a video of a MY-CPE lecture, the User is not provided with any notification that their Personally Identifiable Information is being shared.

37.     Defendant also fails to obtain Subscribers' written consent to collect and disclose their Personally Identifiable Information "in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer," as the VPPA requires.

### III.    MY-CPE Fails to State It Discloses Personally Identifiable Information, as Required under the VPPA.

38.     Defendant's operative privacy policy describes "[t]he only personally identifiable information MY-CPE obtains about individual users through our website or mobile application is information supplied voluntarily by the user."[8]

39.     Furthermore, Defendant's privacy policy states "MY-CPE does not sell, rent, or lease its customer information to unrelated third parties."[9]

40.     The circumstances under which Defendant states that it may disclose a User's personal information do not include the disclosure of Personally Identifiable Information to third parties like Facebook.

---

[8] v (Oct. 18, 2024).

[9] *Id.*

41.    Nowhere in MY-CPE's privacy policy does Defendant disclose that it will share Subscribers' private and protected Personally Identifiable Information with unauthorized third parties.

## IV. Facebook and the Meta Pixel.

42.    Facebook is the largest social networking site on the planet, touting 2.9 billion monthly active users. Facebook describes itself as a "real identity platform,"[10] meaning users are allowed only one account and must share "the name they go by in everyday life."[11] To that end, when creating an account, users must provide their first and last name, along with their birthday and gender.

43.    Facebook sells advertising space by highlighting its ability to target users.[12] Facebook can target users so effectively because it surveils user activity both on and off its site. This allows Facebook to make inferences about users beyond what they explicitly disclose, like their "interests," "behavior," and "connections."[13] Facebook compiles this information into a generalized dataset called "Core Audiences," which advertisers use to apply highly specific filters and parameters for their targeted advertisements.[14]

---

[10] Sam Schechner and Jeff Horwitz, *How Many Users Does Facebook Have? The Company Struggles to Figure It Out*, WALL. ST. J. (Oct. 21, 2021).

[11] FACEBOOK, COMMUNITY STANDARDS, PART IV INTEGRITY AND AUTHENTICITY, https://www.facebook.com/communitystandards/integrity_authenticity.

[12] WHY ADVERTISE ON FACEBOOK, https://www.facebook.com/business/help/205029060038706.

[13] AD TARGETING: HELP YOUR ADS FIND THE PEOPLE WHO WILL LOVE YOUR BUSINESS, https://www.facebook.com/business/ads/ad-targeting.

[14] EASIER, MORE EFFECTIVE WAYS TO REACH THE RIGHT PEOPLE ON FACEBOOK, https://www.facebook.com/business/news/Core-Audiences.

44.     They can do so through two mechanisms: by manually uploading contact information for customers, or by utilizing Facebook's "Business Tools," which collect and transmit the data automatically. One such Business Tool is the Meta Pixel.

45.     The Meta Pixel is a piece of code that advertisers, like Defendant, can integrate into their website. Once activated, the Meta Pixel "tracks the people and type of actions they take."[15] When the Meta Pixel captures an action, it sends a record to Facebook. Once this record is received, Facebook processes it, analyzes it, and assimilates it into datasets like the Core Audiences and Custom Audiences.

46.     Facebook also uses unique and persistent identifiers that are assigned to each user. The Pixel transmits the user's c_user cookie, which contains that user's unencrypted Facebook ID, and allows Facebook to link the user's online communications and interactions to their individual Facebook profile. With a user's FID, Facebook and any ordinary person can look up user's profiles.

47.     MY-CPE installed the Meta Pixel on its Website, which discloses Plaintiff's and Class Members' Personally Identifiable Information to Facebook, because MY-CPE benefits financially from the advertising and information services that stem from use of the Meta Pixel.[16]

---

[15] RETARGETING, https://www.facebook.com/business/goals/retargeting.

[16] In addition to the Pixel, upon information and belief Defendant also installed and implemented Facebook's Conversions API ("CAPI") on its Website servers. Unlike the Meta Pixel which co-opts a website user's browser and forces it to transmit information to Facebook in addition to the website owner, CAPI does not cause the user's browser to transmit information directly to Facebook. Instead, CAPI tracks the user's website interaction, including Personally Identifiable Information, records and stores that information on the website owner's servers, and then transmits the data to Facebook from the website owner's servers. *See* https://revealbot.com/blog/facebook-conversions-api/. Because CAPI is located on the website owner's servers and is not a bug planted onto the website user's browser, it allows website owners like Defendant to circumvent any ad blockers or other denials of consent by the website user that would prevent the Pixel from sending subscribers' Personally Identifiable Information to Facebook directly.

48.    When a MY-CPE User visits the Website or other streaming product and watches videos on the website, Defendant discloses certain information about the viewer including, but not limited to, their identity and the media content the User watched, to Facebook. Specifically, MY-CPE sends the titles of the video content and, most notably, the viewers' personally identifiable information to third parties.

49.    When a Facebook user with a personally identifiable Facebook cookie like an FID on their browser views videos on the Website, that MY-CPE product, through its computer code, causes the user's identity and viewed videos to be transmitted to Facebook.

50.    This transmission is not the User's decision but results from Defendant's purposeful use of its Facebook tracking pixels by incorporation of those pixels and code into the Website. Defendant could easily program the Pixel so that this information is not automatically transmitted to Facebook when a subscriber views videos.

51.    Facebook can easily identify any individual on its Facebook platform with only their unique FID, as can any ordinary person who comes into possession of an FID.

52.    Facebook admits as much on its website. Indeed, ordinary persons who come into possession of the FID can connect to any Facebook profile. Simply put, with only an FID and the video content name and URL—all of which Defendant knowingly and readily provides to Facebook without any consent from the Subscribers—any ordinary person could learn the identity of the digital subscriber and the specific video or media content they requested on the website.

53.    At all relevant times, MY-CPE knew that the Facebook Pixel disclosed Personally Identifiable Information to Facebook. This was evidenced from, among other things, the functionality of the Pixel, including that it enabled Defendant to show targeted advertising to its Subscribers based on the products those Subscribers had previously viewed on the Website.

## V.    MY-CPE Unlawfully Discloses Its Subscribers' Personally Identifiable Information to Unauthorized Third Parties.

54.    To access MY-CPE Website's content, Subscribers must enroll with MY-CPE and pay a subscription fee of $199.

55.    MY-CPE's Website hosts the Meta Pixel and transmits PageView data and other events to Facebook, which include descriptive Uniform Resource Locators ("URL") dedicated solely to MY-CPE videos, including the titles of those videos.

56.    MY-CPE is ***not*** sharing anonymized, non-personally identifiable data with third parties like Facebook. To the contrary, the data it discloses is tied to unique identifiers, including the FID, that identify specific subscribers. Defendant has thus monetized its database by disclosing its Subscribers' Personally Identifiable Information to third parties without the consent of its Subscribers and to the detriment of their legally protected privacy rights.

57.    For instance, as shown in the screenshot below, when a User navigates to the website and selects a CPA Exam Review course to purchase, Defendant discloses to Facebook the Personally Identifiable Information to Facebook via several 'events' including Pageview and SubscribedButtonClick:





***Figures 1 & 2: Examples of a HTTP single communication session sent from the customer's device by MY-CPE's Pixel to Facebook that reveals the fact that the user is reviewing one of Defendant's online courses, along with the customer's unique personal identifiers including the FID (c_user field) and the _fbp cookie.***

58.     In order to complete the purchase, MY-CPE requires users to sign up for an account, providing their personally identifiable information including name, email, phone and location.

59.     In addition to configure its Pixel MY-CPE also chose to configure the so-called "Advanced Matching" feature for its Pixel, which tracks and discloses to Facebook Subscribers' additional personal identifiers entered into the Website forms, including the User's email, phone number, city and zip code – as reflected in the [udff] value parameters below, *Figures 3 & 4*:





60.    Facebook uses this PII, including the c_user cookie data, to identify and match Subscribers and the video content they purchased and viewed on the Website, to its own database of Facebook users.

61.    MY-CPE continues to track and disclose to third parties its customers' Personally Identifiable Information as they sign up for an account with MY-CPE, including the online courses they request or watch.

62.    For example, after the User clicks a "Start Learning" or "Watch Now" button on a particular course's webpage, Defendant's pixel discloses this action, along with the course name and Subscriber's email, to Facebook.

*Figure 5: Example of a HTTP single communication session sent from the customer's device by MY-CPE's Pixel to Facebook that reveals the fact that the user is preparing to start watching one of Defendant's online courses, along with the customer's unique personal identifiers:*



63.     When the User clicks the "Watch Now" button, MY-CPE continues to track and disclose customers' Personally Identifiable Information, including the actions they take (for example, whether they resume a specific video after pausing it) alongside their unique personal identifiers, including their FID.

*Figures 6 & 7: Examples of HTTP communication sessions sent from the customer's device by MY-CPE's Pixel to Facebook that reveal the fact that the subscriber is watching the online course "Emerging Trends in Cannabis Security: Navigating Technological Advancements and Regulatory Shifts," along with the customer's unique personal identifiers including the FID (c_user field):*



64.     As a result of MY-CPE's data compiling and sharing practices, Defendant has knowingly disclosed to Facebook for its own profit the Personally Identifiable Information of Defendant's Subscribers, together with additional sensitive personal information.

65.     MY-CPE does not seek its Subscribers' prior written consent to the disclosure of their Personally Identifiable Information (in writing or otherwise) and its customers remain unaware that their Personally Identifiable Information and other sensitive data is being disclosed to unauthorized third parties.

66.     By disclosing its Subscribers' Personally Identifiable Information to unauthorized third parties—which undeniably reveals their identity and the specific video materials they purchased from and viewed on Defendant's Website—Defendant has intentionally and knowingly violated the VPPA.

67.     In addition, www.MY-CPE.com collects the code for at least twelve different Facebook cookies, even inside the customer portal:



68.     When someone who is logged into Facebook watches or purchases a video on MY-CPE's Website, the Pixel transmits the Personally Identifiable Information from these Facebook cookies to Facebook along with their "event" data.

69.     For instance, the c_user cookie contains a visitor's Facebook ID.  A Facebook ID is personally identifiable information. Anyone can identify a Facebook profile—and all personal information publicly listed on that profile—by appending the Facebook ID to the end of facebook.com (facebook.com/FID#).

70.     The combination of the PageView, SubscribedButtonClick, and other events' data and the information from Facebook's cookies embedded on MY-CPE's Website permits Facebook to identify exactly who watched a specific video.

71.     Defendant does not disclose that the Pixel or any other tracking technology embedded in the Website's source code track, record, and transmit Plaintiff's and Class Members' Personally Identifiable Information to Facebook and other third parties.

## PLAINTIFF'S EXPERIENCE

72.     Plaintiff Marteney purchased an annual subscription from MY-CPE on or around October 20, 2022. Plaintiff purchased a MY-CPE "Unlimited Access" subscription on or around December 4, 2023.

73.     Plaintiff became a User and Subscriber of MY-CPE's services by providing, among other information, her name, address, phone number, email address, IP address (which informs Defendant as to the city and zip code she resides in as well as her physical location), and any cookies associated with her devices.  Accordingly, Plaintiff requested or obtained, and is therefore a consumer of, prerecorded video material sold by Defendant on its Website.

74.     Plaintiff watched videos on the MY-CPE from October 2022 until October 2023 and from December 2023 through the present.

75.     During the relevant time period, Plaintiff used her MY-CPE digital subscription to view videos and related video services through the MY-CPE Website, while logged into her

Facebook account, on her laptop and iPad. Plaintiff has used and continues to use the same devices to maintain and access an active Facebook account throughout the relevant period in this case.

76.     Plaintiff has had an active Facebook account since at least 2009. Her Facebook account is in her real name and displays her personally identifiable information such as her name and photos to the general public.

77.     When Plaintiff purchased and watched videos through MY-CPE, Defendant disclosed her event data, which recorded and disclosed the video's title to Facebook. Defendant also disclosed Plaintiff Marteney's personally identifiable information, including her Facebook ID, to Meta.

78.     Plaintiff never consented, agreed, authorized, or otherwise permitted Defendant to disclose her Personally Identifiable Information to third parties.

79.     Plaintiff has never been provided any written notice that Defendant discloses her User's Personally Identifiable Information or any means of opting out of such disclosures of her Personally Identifiable Information.

80.     Defendant nonetheless knowingly disclosed Plaintiff's Personally Identifiable Information to third parties.

81.     Because Plaintiff is entitled by law to privacy in her Personally Identifiable Information, Defendant's disclosure of her Personally Identifiable Information deprived Plaintiff of the full set of benefits to which she is entitled.

**TOLLING, CONCEALMENT & ESTOPPEL**

82.     The applicable statutes of limitation have been tolled as a result of Defendant's knowing and active concealment and denial of the facts alleged herein.

83.     Defendant secretly incorporated the Meta Pixel into its Website, providing no indication to Subscribers that their Personally Identifiable Information would be disclosed to unauthorized third parties.

84.     Defendant had exclusive knowledge that the Meta Pixel was incorporated on its Website, yet failed to disclose that fact to Subscribers, or inform them that by purchasing and watching videos on the Website Plaintiff's and Class Members' Personally Identifiable Information would be disclosed to third parties, including Facebook.

85.     Plaintiff and Class Members could not with due diligence have discovered the full scope of Defendant's conduct because the incorporation of the Meta Pixel is highly technical and there were no disclosures or other indications that would inform a reasonable consumer that Defendant was disclosing and allowing Facebook to intercept Subscribers' Personally Identifiable Information.

86.     As alleged above, Defendant had a duty to disclose the nature and significance of its data disclosure practices, including the disclosure of Subscribers' Personally Identifiable Information but failed to do so. Defendant is therefore estopped from relying on any statute of limitations under the discovery rule.

87.     Plaintiff did not discover that Defendant disclosed her Personally Identifiable Information to unauthorized third parties until October 2024, after contacting undersigned counsel and discussing potential claims against Defendant.

## CLASS ALLEGATIONS

88.     **Class Definition:** Plaintiff seeks to represent a class of similarly situated individuals defined as follows:

> All persons in the United States who, while maintaining an account
> with Meta Platforms, Inc. f/k/a Facebook, Inc: (i) were registered

21

subscribers of an online website, mobile application and/or any video-on-demand service or application owned, controlled, and/or operated by MY-CPE and (ii) who viewed videos on an online website, mobile application, or any video-on-demand service or application owned, controlled, and/or operated by MY-CPE.

89. Subject to additional information obtained through further investigation and discovery, the above-described Class may be modified or narrowed as appropriate, including through the use of multi-state subclasses.

90. **Numerosity (Fed. R. Civ. P. 23(a)(1)):** Class members are so numerous that their individual joinder herein is impracticable. On information and belief, members of the Class number in at least the tens of thousands. At this time, Plaintiff does not know the exact number of members of the aforementioned Class. However, given the popularity of Defendant's Website, the number of persons within the Class and Subclass is believed to be so numerous that joinder of all members is impractical. And such information is available to Defendant.

91. **Commonality and Predominance (Fed. R. Civ. P. 23(a)(2), 23(b)(3)):** There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class that predominate over questions that may affect individual members of the Class include:

      (a) whether Defendant collected Plaintiff's and the Class's personally identifiable information and video viewing activity;

      (b) whether Defendant unlawfully disclosed and continues to disclose its Subscribers' personally identifiable information and video viewing activity in violation of the VPPA;

      (c) whether Defendant's disclosures were committed knowingly; and

      (d) whether Defendant disclosed Plaintiff's and the Class's personally identifiable information and video viewing activity without consent.

92. **Typicality (Fed. R. Civ. P. 23(a)(3)):** Plaintiff's claims are typical of those of the Class and Subclass because Plaintiff, like all members of the Class and Subclass, used Defendant's

Website to watch videos, and had her personally identifiable information and video viewing activity collected and disclosed by Defendant.

93.     **Adequacy (Fed. R. Civ. P. 23(a)(4):** Plaintiff has retained and is represented by qualified and competent counsel who are highly experienced in complex consumer class action litigation, including litigation concerning the VPPA. Plaintiff and her counsel are committed to vigorously prosecuting this class action. Moreover, Plaintiff is able to fairly and adequately represent and protect the interests of the Class and Subclass. Neither Plaintiff nor her counsel has any interest adverse to, or in conflict with, the interests of the absent members of the Class or Subclass. Plaintiff has raised viable statutory claims or the type reasonably expected to be raised by members of the Class, and will vigorously pursue those claims. If necessary, Plaintiff may seek leave of this Court to amend this Class Action Complaint to include additional representatives to represent the Class and Subclass, additional claims as may be appropriate, or to amend the definition of the Class and Subclass to address any steps that Defendant took.

94.     **Superiority (Fed. R. Civ. P. 23 (b)(3)):** A class action is superior to other available methods for the fair and efficient adjudication of this controversy because individual litigation of the claims of all members of the Class and Subclass is impracticable. Even if every member of the Class and Subclass could afford to pursue individual litigation, the court system could not. It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed. Individualized litigation would also present the potential for varying, inconsistent or contradictory judgments, and would magnify the delay and expense to all parties and to the court system resulting from multiple trials of the same factual issues. By contrast, the maintenance of this action as a class action, with respect to some or all of the issues presented herein, presents few management difficulties, conserves the resources of the parties and of the court system and protects

the rights of each member of the Class and Subclass. Plaintiff anticipates no difficulty in the management of this action as a class action.

## CAUSES OF ACTION

### COUNT I
**VIOLATION OF THE VIDEO PRIVACY PROTECTION ACT, 18 U.S.C. § 2710,** *et seq.*
(*__On behalf of Plaintiff & the Class__*)

95.     Plaintiff incorporates the preceding paragraphs by reference as if fully set forth herein.

96.     The VPPA prohibits a "video tape service provider" from knowingly disclosing "personally identifying information" concerning any consumer to a third-party without the "informed, written consent (including through an electronic means using the Internet) of the consumer." 18 U.S.C § 2710.

97.     Defendant is a "video tape service provider" because it has created, hosted, sold, and delivered hundreds of videos on its Website, thereby "engag[ing] in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4).

98.     As defined in 18 U.S.C. § 2710(a)(1), a "'consumer' means any renter, purchaser, or consumer of goods or services from a video tape service provider."  Plaintiff and members of the Class are "consumers" because they subscribed to and purchased continuing education and test preparation courses which included prerecorded video material from Defendant on MY-CPE's Website. 18 U.S.C. § 2710(a)(1).

99.     75.     As defined in 18 U.S.C. § 2710(a)(3), "personally identifiable information" is defined to include "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider."

100.    Defendant knowingly caused Personally Identifiable Information, including the FID and other unique personal identifiers, email addresses, and phone numbers, concerning Plaintiff and Class Members to be disclosed to unauthorized third parties, including Facebook, through its installation and configuration of the Meta Pixel.

101.    The Personally Identifiable Information that Defendant transmitted to Meta constitutes "personally identifiable information" as defined in 18 U.S.C. § 2710(a)(3) because it identified each Plaintiff and Class Member to Meta as an individual who purchased and viewed, and thus "requested or obtained," specific prerecorded video material from Defendant via its Website.

102.    As set forth in 18 U.S.C. § 27109(b)(2)(B), "informed, written consent" must be (1) in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer; and (2) at the election of the consumer, is either given at the time the disclosure is sought or given in advance for a set period of time not to exceed two years or until consent is withdrawn by the consumer, whichever is sooner."

103.    Defendant failed to obtain informed, written consent under this definition from Plaintiff and Class Members.

104.    Nor were Defendant's disclosures made in the "ordinary course of business" as the term is defined by the VPPA.

105.    Defendant's disclosures to Facebook were not necessary for "debt collection activities, order fulfillment, request processing, [or] transfer of ownership." 18 U.S.C. § 2710(a)(2).

106.    In addition, the VPPA creates an opt-out right for consumers in 18 U.S.C. § 2710(2)(B)(iii). It requires video tape service providers to also "provide[] an opportunity for the

consumer to withdraw on a case-by-case basis or to withdraw from ongoing disclosures, at the consumer's election."

107.   Defendant failed to provide an opportunity to opt out as required by the VPPA.

108.   Defendant knew that its disclosures identified Plaintiff and Class Members to third parties. Defendant also knew that Plaintiff's and Class Members' Personally Identifiable Information was disclosed to third parties, because, *inter alia*, Defendant chose, installed, and programmed the Pixel and other tracking technology with the intent that those third parties receive the Personally Identifiable Information, including the Subscribers' personal identifying information, such as their Facebook ID, email addresses and phone numbers.

109.   By disclosing Plaintiff's and the Class's Personally Identifiable Information, Defendant violated Plaintiff's and Class Members' statutorily protected right to privacy in their video-watching habits. *See* 18 U.S.C. § 2710(c).

110.   As a result of the above violations, Defendant is liable to the Plaintiff and Class Members for actual damages related to their loss of privacy in an amount to be determined at trial or alternatively for "liquidated damages not less than $2,500 per plaintiff."

111.   Defendant is also liable for reasonable attorney's fees, and other litigation costs, injunctive and declaratory relief, and punitive damages in an amount to be determined by a jury, but sufficient to prevent the same or similar conduct by the Defendant in the future.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff seeks a judgment against Defendant, individually and on behalf of all others similarly situated, as follows:

(a) For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure, naming Plaintiff as representative of the Class, and naming

Plaintiff's attorneys as Class Counsel to represent the Class and Subclass;

(b) For an order declaring that Defendant's conduct violates the statutes referenced herein;

(c) For an order finding in favor of Plaintiff and the Class and Subclass on all counts asserted herein;

(d) An award of statutory damages to the extent available;

(e) For punitive damages, as warranted, in an amount to be determined at trial;

(f) For prejudgment interest on all amounts awarded;

(g) For injunctive relief as pleaded or as the Court may deem proper; and

(h) For an order awarding Plaintiff and the Class and Subclass their reasonable attorneys' fees and expenses and costs of suit.

## **JURY DEMAND**

Plaintiff demands a trial by jury of all issues so triable.

Dated: November 15, 2024                    Respectfully submitted,

*s/ Leigh S. Montgomery*
Leigh S. Montgomery
**EKSM, LLP**
1105 Milford Street
Houston, Texas 77006
Tel: (713) 554-2377
E: lmontgomery@eksm.com

and

27

**ALMEIDA LAW GROUP LLC**
David S. Almeida*
Matthew J. Langley*
849 W. Webster Avenue
Chicago, Illinois 60614
Tel: (312) 576-3024
E: david@almeidalawgroup.com
E: matt@almeidalawgroup.com

***Counsel for Plaintiff & the Putative Class***

* *Pro Hac Vice* forthcoming